IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MIDDLEBERG, RIDDLE & GIANNA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-0352-N |
| | § | |
| THE ADMINISTRATORS OF THE | § | |
| TULANE EDUCATIONAL FUND D/B/A | § | |
| TULANE UNIVERSITY MEDICAL | § | |
| GROUP, | § | |
| | § | |
| Defendant. | § | |

## ORDER

On May 9, 2011, the Court granted the parties' joint motion to submit case on briefs in lieu of bench trial [39]. After examining the record, the Court makes the following findings of fact and conclusions of law:

Because the Court finds that Plaintiff Middleberg, Riddle & Gianna's ("MRG") Answer expanded the scope of its Complaint and because the Answer was untimely, the Court grants Defendant The Administrators of the Tulane Educational Fund d/b/a Tulane University Medical Group's ("TUMG") motion to strike certain portions of MRG's Answer [40]. Because the Court holds that there was no substantial evidence to support MRG's decision to deny benefits, the Court denies MRG's motion for summary judgment [18] and grants summary judgment for TUMG. Because MRG did not substantially comply with the Employee Retirement Income Security Act of 1974's ("ERISA") full and fair review provision and because the Court holds that MRG's Plan Administrator's decision to deny

ORDER – PAGE 1

benefits was an abuse of discretion, the Court holds that MRG is liable for substantive

damages in the amount of the denied claims.

## I. ORIGINS OF THE MRG-TULANE DISPUTE

The Court finds that:

1.    MRG funds an employee welfare benefit plan (the "Plan") governed by ERISA.

2.    "SP"[1] is an employee of MRG who obtained health insurance coverage through the Plan for himself and his family members, "NP" and "BP."

3.    NP and BP suffer from hemophilia.

4.    Dr. Cindy A. Leissinger, an employee of TUMG and head of TUMG's Comprehensive Hemophilia Research and Care Center (the "Center"), treats both NP and BP.

5.    TUMG accidently routed a payment made by MRG for NP and BP's treatment to TUMG's Office of Development, although the payment was made out to Dr. Leissinger.

6.    TUMG then sent two letters to MRG thanking MRG for its donation ("Gift Letters").

7.    After receiving the Gift Letters, the Plan Administrator attempted to recover the payment and issued a directive to Group & Pension Administrators ("GPA"), the Claims Administrator for MRG, that it should deny future similar claims for payment for NP and BP.

8.    The Plan denied benefits because the treatment – infusion of the prescription drug Advate – was not medically necessary and was experimental/investigational.

---

[1]In order to maintain the patients' personal information, the Court will refer to them by their initials.

9.    TUMG and SP appealed the denial on behalf of NP and BP, providing information regarding the medical necessity of the prescribed drug and its nonexperimental nature.

10.   TUMG also wrote a letter to MRG explaining that it erroneously sent the Gift Letters to them.

11.   MRG then requested that TUMG provide a written explanation specifically addressing how the payments came to be classified as gifts, a statement as to why the patients did not fit into any of the research criteria or patient parameters for any of Dr. Leissinger's several hemophilia studies, and copies of all of Dr. Leissinger's research and grant applications.

12.   Before receiving a response, MRG's Plan Administrator denied NP and BP's appeal based on information it had currently available.

13.   TUMG subsequently responded to MRG's request for information by stating that it had already provided sufficient information related to medical necessity and had already explained that the Gift Letters were the result of administrative error.

14.   MRG then affirmed its denial of benefits "in light of the statements" in TUMG's correspondence and its "failure to provide any information requested by the Plan."

15.   MRG brought this action on February 22, 2010, seeking a declaratory judgment that the medical treatment is not covered under the terms and conditions of the Plan because it is experimental in nature or not otherwise medically necessary.

16.   TUMG filed a counterclaim under 29 U.S.C. § 1132(a)(1)(B) to recover benefits due under the Plan and enforce rights under the terms of the Plan, as assignee of SP, NP, and BP.

## II. THE COURT STRIKES PORTIONS OF MRG'S ANSWER AS UNTIMELY

Under Rule 12(a)(1)(B), "[a] party must serve an answer to a counterclaim within 21 days after being served with the pleading that states the counterclaim." FED. R. CIV. P. 12(a)(1)(B). Although the Federal Rules of Civil Procedure give the Court some discretion

to allow for untimely filings, *see* FED. R. CIV. P. 6(b)(1)(B), it may exercise that discretion only for "cause shown" and "excusable neglect."  4B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1165, at 523 (3d ed. 2002).  The four factors that courts consider in determining excusable neglect are: (1) the danger of prejudice to the other party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reasons for the delay, and (4) whether the movant acted in good faith.  *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993).

The Court finds that:

17.    TUMG served its counterclaim on MRG on May 3, 2010 [3], but, MRG did not file its Answer until May 10, 2011 [37], "after discovery ha[d] closed, pleading deadlines ha[d] passed, and after the parties agreed to submit the case on the briefs[] and filed their opening briefs."  TUMG's Mot. Strike Portions Answer Countercl. 2.

18.    TUMG moves to strike paragraphs eight and nine and the second and third affirmative defenses, arguing that together they "inject new grounds for the denial of the benefits claims not previously or timely stated in [MRG's] complaint."  TUMG's Mot. Strike 2.

19.    MRG's Complaint requested a declaratory judgment that the claims were not covered under the Plan "insofar as the Claims were Experimental/Investigational in nature, or not otherwise Medically Necessary." Compl. 6.

20.    The portions of MRG's Answer at issue point to a novel and untimely argument – that it properly denied the claims based on TUMG's refusal to produce requested information.  *See* MRG's Answer Countercl. TUMG 2, 4; TUMG's Mot. Strike 1-2.

21.    If the Court were to allow MRG's new arguments, essentially broadening the scope of the dispute at this late stage, TUMG would be greatly prejudiced.

22.    MRG did not seek leave of the Court before filing its Answer nearly a year after it was due, and has presented no argument for the late filing.

ORDER – PAGE 4

Accordingly, the Court holds that MRG has failed to show good cause or excusable neglect, and the Court therefore grants TUMG's motion to strike. The Court thus strikes the second and third affirmative defenses and paragraphs eight and nine of MRG's Answer.[2]

### III. THE COURT GRANTS SUMMARY JUDGMENT FOR TUMG

#### A. MRG Violated ERISA's Full and Fair Review Provision by Asserting a New Ground for its Denial of Benefits on Appeal and Failing to Consult a Health Care Professional

In the Fifth Circuit, courts evaluate procedural ERISA challenges under the substantial compliance standard. *Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 154 (5th Cir. 2009). As long as the purpose of ERISA's full and fair review provision, 29 U.S.C. § 1133, is fulfilled, courts excuse technical noncompliance with procedural requirements. *Id.* (citing *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 393 (5th Cir. 2006)). "The purpose of [that section] is 'to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial.'" *Id.* (quoting *Schneider v. Sentry Long Term Disability*, 422 F.3d 621, 627-28 (7th Cir. 2005)). Administrative reviews meet this standard where the beneficiary "'know[s] what evidence the decision-maker relied upon, ha[s] an opportunity to address the accuracy and reliability of the evidence, and . . . the decision-maker consider[s] the evidence presented by both parties prior to reaching and rendering his decision.'" *Id.* (citing *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 598 (5th Cir. 1994)). The Circuit also takes into consideration ERISA regulations regarding what

---

[2]TUMG does not object to the remainder of MRG's Answer and that portion does not raise any novel arguments. The Court therefore orders that the remainder of the Answer stands because although untimely, the Court finds that it is not prejudicial to TUMG.

ORDER – PAGE 5

constitutes a full and fair review.  *See*  29 C.F.R. § 2560.503-1(h); *Lafleur*, 563 F.3d at 154.

The remedy for procedural violations is typically a remand to the plan administrator for a full

and fair review.  *See Grant v. Eaton Disability Long-Term Disability Plan*, 797 F. Supp. 2d

732, 738 (S.D. Miss. 2011) ("When the procedural violations are non-flagrant, remand is

typically preferred over a substantive remedy to which the claimant might not otherwise be

entitled under the terms of the plan."); *Lafleur*, 563 F.3d at 157.  However, "where the record

establishes that the plan administrator's denial of the claim was an abuse of discretion as a

matter of law," substantive damages are appropriate.  *See Lafleur*, 563 F.3d at 157-58.

ERISA requires plan administrators to state the specific grounds upon which they

based their decisions to deny a claim for benefits in their initial notice of denial.  *Robinson*,

443 F.3d at 393.  On appeal, the plan administrator is limited to a review of those specific

grounds, *id.*, to ensure that the beneficiary has a meaningful review and to encourage parties

to make a serious effort at resolving their dispute at the administrative level.  *Cooper v.

Hewlett-Packard Co.*, 592 F.3d 645, 654-55 (5th Cir. 2009).  Courts in this Circuit have held

that assertion of new grounds for a denial of benefits is a violation of ERISA's full and fair

review provision.  *See Grant*,  797 F. Supp. 2d at 736-37 (collecting cases).

MRG now impermissibly asserts novel grounds for its original decision to deny the claims.[3]  In fact, as discussed below, MRG even impermissibly raised a new ground at the administrative level as basis for its rejection of TUMG's appeal.

The Court finds that:

23.    In MRG's explanation of its initial decision to deny, it stated that there was "[no] medical necessity" for the drugs at issue and a "strong supposition" that they were "being prescribed in the context of some form of study environment," thereby qualifying as "experimental/investigational services."[4] *See* MRG's App. 74; TUMG's App. 28-31.

24.    In the course of the appeals, SP and TUMG provided information clearly demonstrating the medical necessity of the treatment and NP and BP's

---

[3]TUMG posits that MRG is now additionally claiming that the Plan Administrator denied benefits because of TUMG's failure to respond to MRG's request and billing irregularities.  TUMG's Resp. 8.  Indeed, MRG does spend a substantial portion of its brief discussing such billing irregularities, *see* Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 7-16 [19], ultimately arguing that "it was the billing anomalies . . . which contributed to the Plan Administrator's review and *ultimate decision to deny* the subject claims." *Id.* at 39 (emphasis added).  Since this explanation is absent from the administrative record and appears for the first time in MRG's brief, it is improperly before the Court, and the Court will not consider it.

Similarly, in its analysis of the claims, the Court will not consider the letter from Dr. Leissinger to Jonathan Herman at MRG dated January 7, 2010 since it was written after the administrative record was closed, TUMG's App. 105, or the affidavits and similar materials within the appendices generated specifically for purposes of trial.

The Court addresses the failure to respond grounds in the text above.

[4]MRG stated that its denial was based on the following alleged facts: (1) Dr. Leissinger's position as a research physician and head of the Center, (2) Dr. Leissinger's ongoing research/trials related to various hemophilia disorder medication and dosage levels, (3) NP and BP beginning the medication regimen only after seeing Dr. Leissinger in 2008 and without any indication that preexisting treatment approaches were inappropriate, and (4) the Gift Letters.  *See* App. Pl. MRG's Br. Opp'n Def.'s Mot. Summ. J. 74 [20-4] [hereinafter MRG's App.]; App. TUMG's Resp. Pl.'s Cross-Mot. Summ. J. 28-31 [44-1] [hereinafter TUMG's App.].

ORDER – PAGE 7

nonparticipation in the Center's research.  *See, e.g.*, MRG's App. 71, 171-83, 190-234.

25.    MRG then requested more information of TUMG that was purportedly pertinent to the coverage determination.[5]

26.    But, TUMG's request for information was far beyond the scope of information necessary to make a determination of medical necessity and experimental/investigational nature.

27.    TUMG refused to provide the requested information.  MRG's App. 241 ("We believe that we have provided you with sufficient information to make a determination regarding the medical necessity of the Services provided . . . .").

28.    MRG then issued a final denial specifically on the grounds that TUMG failed to provide the requested information.  *See* MRG's App. 243 ("In light of the statements contained [in TUMG's letter to MRG refusing to provide the information] *and [TUMG]'s failure to provide any information requested by the Plan* . . . the Plan denies payment of the Claims." (emphasis added)).

29.    Thus, TUMG asserted a new procedural ground for denying SP and TUMG's claims, separate and distinct from its initial decision to deny based on lack of medical necessity and the treatment's supposed experimental nature.[6]

_____

[5]The Plan Administrator requested that TUMG provide "copies of *all of Dr. Leissinger's studies and research materials*, as well as *any grant applications*" during her treatment of NP and BP.  MRG's App. 235 (emphasis added).  He additionally requested a "written statement as to why the Patients did *not* fit the research criteria or patient parameters of *any* such studies and or [sic] grant requests." *Id.* (second emphasis added).  Finally, MRG requested that TUMG provide "a written explanation of how [the payment at issue] came to be described by [TUMG], on no less than two occasions, as a tax deductible gift for which no goods or services were rendered," *id.*, even as TUMG had already explained to the Plan that the letters had been sent in error.  MRG's App. 71.

[6]MRG argues that although it based its final decision to deny on the fact that TUMG failed adequately to respond to its request, the grounds for its denial remained unchanged.  Pl.'s Br. 4 ("On the basis of TUMG's failure to respond to the Plan Administrator's reasonable requests, the Plan Administrator exercised its 'discretionary authority' and issued a final denial fo TUMG's claims on the grounds that the claims were excluded from coverage as Experimental/Investigational.").  However, MRG's post-hoc argument restyling its explanation for its denial of the appeal does not change the fact that MRG's final denial letter

Secondly, under ERISA regulations, a judgment that a particular treatment is experimental, investigational, or not medically necessary is deemed to be medical in nature. *See* 29 C.F.R. § 2560.503-1(h)(3)(iii) ("[I]n deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, *including determinations with regard to whether a particular treatment, drug, or other item is experimental, investigational, or not medically necessary or appropriate*, the appropriate named fiduciary shall consult with a health care professional . . . ." (emphasis added)).  In such cases, ERISA regulations require administrators to consult with health care professionals in reviewing a denial of benefits.  *Id.*  As such, failing to do so is also a violation of ERISA's full and fair review provision. *See* 29 C.F.R. § 2560.503-1(h)(3) ("The claims procedures of a group health plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless" it "consult[s] with a health care professional who has appropriate training and experience in the field of medicine involved in the [determination regarding whether a drug or treatment is experimental or not medically necessary].").

---

specifically stated that the claim was being denied based on TUMG's failure to respond. Indeed, throughout MRG's briefs on the instant motions, it argues that the appeals were denied specifically because TUMG failed to respond to its request. *See, e.g.*, Pl.'s Br. 37 ("TUMG's failure to respond to the Plan Administrator's inquiries concerning whether the treatment was Experimental/Investigational, as defined under the Plan, caused the Plan Administrator to deny the claims on that basis.").  Despite the plentiful evidence of this new impermissible procedural ground, the Court notes that regardless whether it had found this to be a novel ground or not, the outcome of the judgment would not change, as MRG's request for additional information was arbitrary and capricious in itself.

30.    The Court finds that the Plan Administrator never consulted a medical professional regarding the claim.[7]

The Court holds that these procedural violations did not afford TUMG a meaningful review of MRG's denial of benefits, and as such, the Court holds the purpose of section 1133 was not fulfilled. Accordingly, the Court holds that MRG did not substantially comply with ERISA's full and fair review provision. And, because the Court holds later in this Order that MRG abused its discretion in denying the claims, remand is inappropriate and substantive damages in the amount equal to the denied benefits are appropriate.[8]

---

[7]MRG's position is that "the question of medical necessity is secondary to that of coverage, making this 'fact' [that MRG failed to consult with a physician] legally irrelevant." Pl.'s Br. 37. MRG is incorrect.

Under the direct terms of the Plan, a treatment is considered "covered" if it is: "1. Ordered by a Physician or licensed Practitioner[,] 2. *Medically Necessary for the treatment of an illness or injury*[,] 3. Not of a luxury or personal nature[,] *and* 4. Not excluded under the Major Medical Exclusions and Limitations section of this Plan." MRG's App. 158 (emphasis added). As such, a treatment is not covered under the Plan *unless it is medically necessary*. Thus, it is disingenuous for MRG to argue that a medical necessity determination necessarily comes after a coverage determination.

[8]The Court finds that the amount of the denied benefits equals $189,635.12. *See* MRG's App. 218 (showing unpaid amount $93,901.16); TUMG's App. 30-31, 355, 359-61 (showing unpaid amount $95,733.96).

Additionally, courts have the discretion to award prejudgment interest in ERISA cases, and in such cases, it is appropriate too look to state law for guidance. *See*, *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991). "Section 304.003 of the Texas Finance Code establishes the rate of prejudgment interest at the postjudgment interest rate." *Alexander v. Hartford Life & Accident Ins. Co.*, 2010 WL 3660054 (N.D. Tex. 2010) (Kaplan, Mag. J.), *affirmed by* 2010 WL 3659999 (N.D. Tex. 2010) (Lynn, J.); TEX. FIN. CODE § 304.003. During the relevant period, the applicable state postjudgment interest rate was 5%. *See* Texas Office of Consumer Credit Commissioner, Judgment Rate Summary, *available at* http://www.occc.state.tx.us/pages/int_rates/December%2011%20Judgment%20Rate%20Summary%20for%20Web.pdf (last visited Dec. 6, 2011).

The Court finds that prejudgment interest is appropriate here, where payment has been delayed for more than three years for the earliest claim. Accordingly, the Court awards

## B. MRG Abused Its Discretion in Denying the Claims Because Substantial Evidence Supported Coverage

In reviewing a Plan Administrator's denial of benefits, courts must "review the actual 'basis for [the administrator's] denial' of benefits, not its post-hoc rationalization." *Robinson*, 443 F.3d at 395-96 n.4 (5th Cir. 2006) (alterations in original) (quoting *Vega v. Nat'l Life Ins. Serv., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999)). Thus, this Court goes on to determine whether the claim was properly denied as not medically necessary and/or experimental.

### 1. The Court Reviews the Plan Administrator's Decision Under an Abuse of Discretion Standard.[9] – Where an ERISA plan gives the Administrator discretion to determine claims for benefits, courts apply an abuse of discretion standard in reviewing a decision to deny benefits. *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "This is the functional equivalent of arbitrary and capricious review." *Id.* (citing *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 214 (5th Cir. 1999)). The decision must have a rational connection with known facts. *Id.* (citing *Meditrust*, 168 F.3d at 215). In addition, the decision must be supported by substantial evidence that is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as

_____

prejudgment interest in the amount of 5%.

[9]MRG argues that the *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 637 (5th Cir. 1992) two-step test is the applicable standard of review. However, where, as here, "[t]he only dispute is an evidentiary one [because] the parties do not disagree over how the Plan should be interpreted," the *Wildbur* test is not applicable. *See Robinson*, 443 F.3d at 395.

adequate to support a conclusion." *Id.* Indeed, the Court "owes no deference . . . to an 'administrator's unsupported suspicions.'" *Id.* (citing *Vega v. Nat'l Life Ins. Serv., Inc.*, 188 F.3d 287, 302 (5th Cir. 1999) (en banc)).

The Fifth Circuit has held that where an entity "serves both as the administrator and insurer under the Plan," there is an "inherent conflict of interest." *Robinson*, 443 F.3d at 395. The Supreme Court has held that there is also a conflict where an employer "both funds the plan and evaluates the claims." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). As the Supreme Court explains, "'every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket.' The employer's fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary. Thus, the employer has an 'interest . . . conflicting with that of the beneficiaries.'" *Id.* (omissions and alterations in original) (internal citations omitted). Where an administrator is conflicted, courts weigh the conflict as a factor in their determination of whether there was an abuse of discretion. *Id.*

The Court finds that:

31.    Michael L. Riddle, MRG's Managing Partner, is also the Plan Administrator. MRG's App. 2.

32.    Although MRG has contracted with GPA to serve as Claims Administrator, *id.*, Riddle's involvement in evaluating the TUMG/SP claim proved to be extensive.

33.    Riddle began the initial investigation into the TUMG/SP transactions after he "became aware that a few, large dollar claims were being presented," *id.*; he directed GPA to further investigate the claims based on his findings, *id.* at 3; he issued the directive to GPA to deny further similar claims for NP and BP upon receipt of TUMG's Gift Letters, *id.* at 4; he requested the additional

information from TUMG, *id.* at 5; he directed a response to BP's appeal letters, *id.*; he "considered all material submitted by the Covered Beneficiary and TUMG," *id.* at 6; and he "directed that the claims be denied," *id.* at 7.

34.     From Riddle's sworn affidavit, there is little to no room for GPA's involvement.

35.     Riddle was heavily involved in every aspect of the claim.

Thus, the Court holds that MRG has a conflict of interest under both *Robinson* and

*Glenn*.  Accordingly, the Court weighs this as a factor in its abuse of discretion analysis.

### 2. MRG's Decision to Deny Payment for Benefits Was Arbitrary and Capricious.

– The Court holds that TUMG presented substantial information (concrete evidence) showing

that the treatment at issue was both medically necessary and not part of an experimental

treatment.  Thus, it is plain that MRG abused its discretion in denying the claim.

The Court finds that the administrative record clearly establishes that:

36.     Under the plain language of the Plan, a treatment is experimental where one of the following is true: (1) it cannot be marketed without approval of the U.S. Food and Drug Administration ("FDA") and FDA approval has not yet been given, (2) reliable evidence shows it is the subject of an ongoing Phase I, II, or III clinical trial/scientific study to determine its maximum tolerated doses, toxicity, safety, efficacy, or its efficacy as compared with the standard means of treatment, (3) the patient is required to sign a consent form which indicates the proposed treatment is part of a scientific study to determine its effectiveness or safety, (4) reliable evidence shows that expert opinion is that further studies/trials are necessary to determine its maximum tolerated dose, toxicity, safety, efficacy, or its efficacy as compared with the standard means of treatment, or (5) it is not considered standard treatment (i.e. not of proven benefit for a particular diagnosis) by the majority of the medical community, government financed programs, or the National Cancer Institute.  MRG's App. 160-61.

37.     The FDA approved Advate, the prescription drug at issue, in 2003.  MRG's App. 174.

38.    The National Heart, Lung, and Blood Institute reports that Advate's use – to raise temporarily the level of clotting factor VIII in the blood – has become the standard treatment for individuals with hemophilia. MRG's App. 175, 181 ("The main treatment for hemophilia is called replacement therapy. Concentrates of clotting factor VIII . . . are slowly dripped in or injected into a vein.").

39.    The National Hemophilia Foundation calls the treatment the "optimal therapy." MRG's App. 210.

40.    There is no evidence in the administrative record that shows that further trials are necessary to determine the treatment's maximum tolerated dose, toxicity, safety, or efficacy.

Thus, the Court holds that prongs (1), (4), and (5) are clearly satisfied because the Administrator had substantial information before him to find that (1) the drug was approved by the FDA, (4) there is no reliable evidence that shows that expert opinion is that further studies/trials are necessary to determine the treatment's maximum tolerated dose, toxicity, safety, efficacy, or its efficacy as compared with the standard means of treatment, and (5) the treatment is considered to be the standard treatment (i.e. proven benefit for a particular diagnosis) by the majority of the medical community, government financed programs, or the National Cancer Institute.

The Court further finds that the administrative record establishes that:

41.    NP and BP were not participating in any of Dr. Leissinger's clinical trials. *See, e.g.*, MRG App. 78, 173, 241.

42.    BP had been receiving infusions two to three times per week prior to resuming the care at issue with Dr. Leissinger[10] and NP too needed infusions as a

---

[10]The Court finds that:

Dr. Leissinger cared for NP and BP as early as April 2005. MRG's App. 221. NP and BP relocated to North Carolina because of Hurricane Katrina in the summer of 2005, and

symptomatic carrier.  MRG's App. 178, 217, 219-26; TUMG's App. 79, 81-88.

43.    TUMG generated the Gift Letters in error.  MRG's App. 71, 79, 241.

Thus, the Court holds that prong (2) is not triggered because the Administrator had substantial information before him to make the determination that the treatment was not part of an ongoing scientific study.

Finally, in its brief, MRG highlights prong (3) for the Court, arguing that since NP and BP signed a consent form for the primary purpose of monitoring the safety of the nation's blood supply, the treatment qualifies as experimental.  Pl.'s Br. 26.

However, the Court finds that the administrative record establishes that:

44.    The consent form at issue is part of the Universal Data Collection National Hemophilia Registry ("UDC") established by the U.S. Department of Health and Human Services' ("HHS") Centers for Disease Control ("CDC").

45.    TUMG is required to ask its patients to consent.  MRG's App. 241.

46.    This is far from consent to participate in a scientific study, since the program is merely a statistical data collection service run by the United States government.

As such, the Court holds that prong (3) is not triggered because the Administrator had substantial information before him to determine that the consent form the patients signed did not indicate that the treatment was part of a scientific study to determine its effectiveness or safety.

_____

the instant claims arose in 2008 after they were once again in Dr. Leissinger's care.

ORDER – PAGE 15

Thus, the Court holds that there existed substantial and concrete evidence before the Administrator that the treatment was not experimental/investigational under the Plan.

The Court further finds that the administrative record clearly establishes that:

47.    Under the plain language of the Plan, a treatment is considered medically necessary where it "is generally accepted and used by the medical community and is appropriate for the condition being diagnosed or treated." MRG's App. 164.

48.    Under the direct language of the Plan, "[n]ot [m]edically [n]ecessary" is defined as "a treatment . . . which does not contribute to the diagnosis of or therapeutic improvement for the condition in question although [a patient's] well-being may be generally enhanced by it. The item can be outmoded or unproved as having diagnostic capability or effect on the condition in question." *Id.*

49.    It is clear from the record that both NP and BP suffer from hemophilia and have had long-standing treatment with the drug Advate, which is the standard, if not optimal, treatment for such patients.

Thus, the Court holds that there existed substantial and concrete evidence before the Administrator that the treatment was medically necessary.

As such, the Court holds that there was no substantial evidence to support the denial of benefits.

Accordingly, the Court holds that the Plan Administrator abused its discretion in denying the claim as not medically necessary and experimental/investigational.

CONCLUSION

ORDER – PAGE 16

Because MRG's Answer was untimely and the Court finds that it expanded the scope of its Complaint, the Court grants TUMG's motion to strike. Because MRG did not afford TUMG a meaningful review of MRG's initial decision to deny benefits and because the Court holds that the Plan Administrator abused its discretion in denying the benefits, the Court awards substantive damages in the amount equal to the denied benefits. Because the Court holds that no substantial evidence supported the denial of benefits, the Court denies MRG's motion for summary judgment and renders judgment for TUMG on MRG's claims and TUMG's counterclaims.

Signed March 6, 2012.

David C. Godbey
United States District Judge